# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 24-CR-471 (RDM) |
| | : | |
| v. | : | |
| | : | |
| NATHANIEL JESSE EVANS, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## UNITED STATES' MOTIONS *IN LIMINE*

The United States respectfully submits this omnibus brief in support of several motions *in limine* in advance of trial scheduled for February 14, 2025.[1] Although neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). "Motions in limine are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011).

The government offers the authorities and analysis below to promote efficiency and reduce the need to argue objections during trial. For each motion herein, the government asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments should the issues arise during trial.

---

[1] The government previously filed its motion in limine at ECF No. 29, but that filing was in error. This filing has been corrected.

## BACKGROUND

The Court is familiar with the riot at the U.S. Capitol on January 6, 2021, which disrupted Congress's certification of the Electoral College vote and forced it to evacuate the House and Senate Chambers. ECF No. 1-1.

On December 19, 2020, the defendant, Nathaniel Jesse Evans ("Evans") texted his co-defendant, Kathryn Diane McEvoy, suggesting that they "go to the Jan 6 rally in DC." McEvoy agreed. On the morning of January 6, 2021, Evans and McEvoy traveled together from Maryland to Washington, D.C. McEvoy and Evans entered restricted Capitol Grounds early in the afternoon of January 6, 2021. Specifically, based on metadata from photographs taken by McEvoy, McEvoy and Evans arrived on the west front of the Capitol within restricted grounds around 1:13 p.m. at the latest, less than twenty minutes after the first breach at Peace Circle. While on the west front, Evans and McEvoy witnessed vandalism, including rioters climbing the inauguration platform scaffolding.

Later that day, Evans and McEvoy joined the mob on the Upper West Terrace, witnessing rioters entering the Capitol through the Senate Wing Doors and the adjacent Senate Parliamentarian Door, also known as the Senate Fire Door. At approximately 2:58 p.m., Evans and McEvoy entered the Capitol through the Senate Parliamentarian Door. By that time, an alarm was blaring and the entrance was crowded by rioters. After a minute, Evans and McEvoy turned into S-131, a room immediately left of the Senate Parliamentarian Door. They remained inside S-131 for approximately two minutes. At approximately 3:01 p.m., officers from U.S. Capitol Police and Metro Transit Police began clearing the hallway outside S-131 and forced rioters, including Evans and McEvoy, to leave. About one minute later, Evans and McEvoy left the Capitol through the

Senate Parliamentarian Door. Evans and McEvoy spent approximately four minutes inside the Capitol and were on restricted Capitol grounds for a total of approximately two hours.

After his time in the Capitol, at 4:03 p.m. on January 6, Evans entered the Google search on his phone, "when tyranny becomes law rebellion becomes duty." A few days later, on January 10, 2021, Evans texted McEvoy a link to a social media post, stating, "What she says makes perfect sense. Pence let us down," indicating that Evans believed the Vice President should not have certified the results of the election.

For his conduct, Evans was charged by Information with violating 18 U.S.C. § 1752(a)(1) (Count One), 18 U.S.C. § 1752(a)(2) (Count Two), 40 U.S.C. § 5104(e)(2)(D) (Count Three), and 40 U.S.C. § 5104(e)(2)(G) (Count Four) on December 5, 2023. ECF No. 20. This Court scheduled jury selection to commence on February 14, 2025.

## ARGUMENT

## I.    MOTION *IN LIMINE* TO ADMIT DEFENDANT'S SIGNED STATEMENT OF OFFENSE.

As this Court knows, Evans signed a plea agreement and statement of offense on November 25, 2024, and he was set to plead guilty to Counts Three and Four of the Information on December 12, 2024. At the plea hearing, Evans indicated that he had changed his mind and wanted to exercise his right to trial. The signed statement of offense is now admissible against Evans at trial because he knowingly and voluntarily waived his rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

Although statements made by a defendant in plea negotiations are generally inadmissible, a defendant may waive these protections so long as there is no indication that the agreement was entered into unknowingly or involuntarily. *See United States v. Mezzanatto*, 513 U.S. 196, 210 (1995); *United States v. Nelson*, 732 F.3d 504, 516-17 (5th Cir. 2013); *United States v. Washburn*, 728 F.3d 775, 779-80 (8th Cir. 2013); *United States v. Mitchell*, 633 F.3d 997, 1006 (10th Cir.

2011); *United States v. Velez*, 354 F.3d 190, 194-95 (2d Cir. 2004); *United States v. Scruggs*, 356 F.3d 539, 545-46 (4th Cir. 2004); *United States v. Burch*, 156 F.3d 1315, 1319, 1322-23 (D.C. Cir. 1998). The defendant bears the burden of proving that his waiver of rights to challenge the admissibility of his plea-related statements and his plea was not knowing and voluntary. *See United States v. Jim*, 839 F. Supp. 2d 1157, 1174-75 (D.N.M. 2012) (citing cases). A trial court must find "some affirmative indication that the agreement was entered into unknowingly or involuntarily." *Burch*, 156 F.3d at 1322 (citation omitted). A "written plea agreement" is "strong evidence" that a defendant "knowingly, intelligently, and voluntarily waived" a right, though other factors include clarity of the agreement, a defendant's and defense counsel's signatures, and statements to the court. *United States v. Lee*, 888 F.3d 503, 507 (D.C. Cir. 2018).

The record in this case warrants enforcing the waiver because several factors demonstrate that Evans waived his rights knowingly and voluntarily, including: (1) the clarity of the plea agreement itself and the defendant's attestations, and (2) the defendant's consultation with a competent attorney and his statements to the Court at the time of the plea hearing.

*First*, the signed plea agreement was clear and unambiguous, specifying his rights, the waiver, and the event triggering waiver. Specifically, the agreement contained language affirmatively waiving his right to limit the admissibility of statements made during plea negotiations:

> Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Ex. A at 5.[2] Because a plea agreement is contractual in nature and governed by traditional contract principles, the plea agreement became binding at the time Evans added his signature. *See Washburn*, 728 F.2d at 781; *see also United States v. Knight*, 867 F.2d 1285, 1288 (11th Cir. 1989) ("Once a plea contract is formed, the policy behind Rule 11[]—to allow a defendant to freely negotiate without fear that statements will be used against him—is no longer applicable."). And there is no indication that Evans waived his rights unknowingly or involuntarily. To the contrary, Evans and his counsel signed the plea paperwork and transmitted it to the government and ultimately to the Court—confirming and manifesting their intent to be bound by the plea agreement. Nor did Evans ever claim that he was coerced to enter the plea or that it was the product of duress. The signature page included an express acknowledgment and attestation that both Evans and defense counsel had "read every page of this Agreement," reviewed it, and that Evans was entering the plea "intending to be legally bound." Ex. A at 9; *see also* Ex. B at 14. Unambiguous waivers, such as this one, are enforceable. *See United States v. Davis*, 45 F.4th 73, 80 (D.C. Cir. 2022) (enforcing appeal waiver despite Rule 11 error in part because "written plea waiver was clear" and defendant attested to reviewing, "understanding and agreeing with its terms").

   *Second*, Evans had competent defense counsel at his disposal when deciding whether to sign the plea agreement. *See Mezzanatto*, 513 U.S. at 210-11 (upholding waiver of FRCP 11(f) and FRE 410 rights, in part, because defendant consulted with his counsel); *see also United States v. Jackson*, 26 F.4th 994, 998-99 (D.C. Cir. 2022) (noting access to "experienced defense attorney" and "standard practice for defense counsel to discuss" waiver matters as factors material to the "knowing and voluntary" determination). At the plea hearing, Evans and his counsel also stated

---

[2] The signed plea agreement is attached as Exhibit A and the signed statement of offense is attached as Exhibit B.

that they had reviewed and understood the plea agreement, consistent with their attestations in the agreement itself. *See* Ex. A at 9; Ex. B at 14. Although this Court did not conduct a formal Rule 11 colloquy, this Court still explained to Evans the consequences of withdrawing from the plea, including that the signed statement of offense could be admissible against him at trial. The record, including the representations by the defense, contains no affirmative challenge to the "knowing" or "voluntary" nature of the plea agreement or the waiver therein. Accordingly, Evans knowingly and voluntarily waived his rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, and therefore the signed statement of offense is admissible against him at trial.

## II.    MOTION *IN LIMINE* TO PRECLUDE QUESTIONING ON SENSITIVE NATIONAL SECURITY INFORMATION.

The government seeks an order limiting Evans from probing, during cross-examination, (1) the exact locations of U.S. Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, and (2) U.S. Secret Service ("Secret Service") protocols. The government does not intend to elicit testimony on any of these topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible. Fed. R. Evid. 611(b). To the extent that Evans argues that these topics are relevant and within the scope of the government's examination, the government requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States*, 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of

government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See, e.g.*, *United States v. Balistreri*, 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief. *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief).

Preventing Evans from exploring (A) the exact locations of U.S. Capitol Police surveillance cameras and (B) Secret Service protocols will not infringe on his Confrontation Clause rights. These topics implicate national security concerns, have little to no relevance to any fact of consequence, and any probative value can be addressed without compromising the protective functions of the U.S. Capitol Police and the Secret Service.

### A.   U.S. Capitol Police CCTV Surveillance Cameras

The government seeks an order limiting Evans from probing, during cross-examination,

the exact locations of U.S. Capitol Police surveillance cameras or from using maps which show each camera's physical location as an exhibit at trial. None of this information serves to illuminate any fact of consequence that is before the jury, and that lack of relevance must be balanced against the national security implications at stake.

The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting members of Congress. The camera maps showing the physical location of cameras have also been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the U.S. Capitol Police Board before they may be released. Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded considering the ongoing security needs of Congress. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. The video footage itself reveals the *general* location and angle of the camera's positioning. Additional details as to the precise location of the cameras are not relevant to the factfinder.

Even assuming the evidence that the government seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security. The Supreme Court has recognized that trial courts' balancing should account for concerns extrinsic to the litigation, such as "witness' safety." *Olden v. Kentucky*, 488 U.S. 227, 232 (1988). Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight. *See, e.g.*, *United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005). If a map that revealed the location of all cameras were introduced in this trial, or in any trial, it would become available to the public and foreign adversaries. Anyone could learn about the U.S. Capitol Police's camera coverage as of

January 6, 2021, and—perhaps more importantly—could learn about the parts of the Capitol where cameras are not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. The Court should therefore grant the government's motion in limine to exclude unnecessary cross-examination about the U.S. Capitol Police's surveillance camera system.

### B. Secret Service Protocols

The government also seeks an order limiting Evans from probing, during cross-examination, Secret Service protocols during an emergency requiring the evacuation of protectees. To meet its burden of proof at trial, the government may call a witness from the Secret Service to testify that, at the time of the riot on January 6, 2021, Secret Service agents were on duty protecting Vice President Mike Pence and his family members, who were present at the Capitol for the Electoral College certification. The witness will further testify about the Capitol riot's effect on the Secret Service's protection of Vice President Pence and his family members.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking officials. The Court should limit cross-examination of the Secret Service witness to questioning about the official functions performed by the Secret Service, namely, protecting the Vice President and his family. The government also requests that the Court preclude cross-examination on certain topics including (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees. These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing

the government's legitimate interest in national security. Fed. R. Evid. 403; *see Mohammed*, 410 F. Supp. 2d at 918 (finding that information having broader national security concerns can be excluded under Rule 403 because its tendency to confuse the issues, mislead the jury, create side issues or a mini-trial and can result in undue prejudice that substantially outweighs any probative value).[3] The Court should therefore grant the government's motion in limine to exclude unnecessary cross-examination about Secret Service protocols.

## III.    MOTION *IN LIMINE* TO PRECLUDE IMPROPER DEFENSE ARGUMENTS

### A.  First Amendment

The government moves this Court to admit statements that evince Evans's knowledge, motive, or intent—which go to prove an element of the offenses with which he is charged.  The government also moves *in limine* to preclude Evans from eliciting evidence or arguing to the jury that his statements and actions were protected by the First Amendment.

---

[3] If Evans believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of U.S. Capitol Police cameras or Secret Service procedures, the government requests that the Court conduct a hearing *in camera* to resolve the issue. Courts have found that *in camera* proceedings are appropriate in circumstances where security concerns like these are present. *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that *in camera* . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that *in camera* proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security"); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially outweighed by the prejudice that disclosure would inflict on the government's security interests. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

1. **The Admission of Defendant's Statements Does Not Violate the First Amendment.**

The government intends to introduce certain statements made by Evans that will aid the jury's determination whether the defendant intended to disrupt government business and the orderly conduct of Congress. For example, on the afternoon of January 6, Evans searched on his phone, "when tyranny becomes law rebellion becomes duty." Just a few days after the riot, Evans texted a link to a social media post stating, "What she says makes perfect sense. Pence let us down," acknowledging his belief that Vice President Pence should not have certified the results of the election. These statements, and others like them,[4] are highly probative of the defendant's knowledge of the certification and his intent to disrupt under Counts Two and Three.

It is well settled that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Because these statements shed light on Evans's motive, knowledge, and intent to disrupt, the statements should be admitted consistent with *Mitchell*—regardless of whether those statements may otherwise constitute speech protected by the First Amendment. Courts in other January 6 cases have consistently allowed evidence of defendants' statements for purposes of showing intent and motive. *See United States v. Robertson*, 588 F. Supp. 3d 114, 124 (D.D.C. 2022) ("Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent. . . . If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification. His words remain relevant to his intent and motive for taking those alleged actions");

---

[4] To be clear, the government intends to introduce additional statements by Evans beyond those referenced here in the motion in limine.

*see also United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021). The Court should do the same here.

### 2. This Court Should Preclude Defendant from Raising a First Amendment Defense.

The government also moves *in limine* to preclude Evans from arguing that his conduct was protected by the First Amendment. None of the offenses under which Evans is charged punish speech. *See, e.g.*, *United States v. Baez*, No. 21-cr-507 (PLF), 2023 WL 3846169 (D.D.C. June 2, 2023) (rejecting January 6 defendant's facial and as-applied challenges under the First Amendment to the same misdemeanors charged here). The charged crimes punish trespassing and disorderly conduct on restricted Capitol grounds. "No matter [the rioter's] political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment." *United States v. Nordean*, 579 F. Supp. 3d 28, 53 (D.D.C. 2021). The Capitol building itself is a nonpublic forum, see *United States v. Nassif*, 97 F.4th 968, 977-78 (D.C. Cir. 2024), and the surrounding grounds were subject to a content-neutral restriction on January 6, 2021, which advanced a substantial government interest in public safety and order—an interest that is "amplified near the Capitol . . . where prominent public officials are present and conducting official government business." *Mahoney v. U.S. Capitol Police Bd.*, 566 F. Supp. 3d 1, 9 (D.D.C. 2022).

Ultimately, the First Amendment provides no defense to the crimes charged even if evidence of the defendant's knowledge and intent is intertwined with political messaging. *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it"); *United States v. Hassan*, 742 F.3d 104, 127-28 (4th Cir. 2014)

12

(citing *Amawi*). Any First Amendment argument advanced by Evans fails as a matter of law and is irrelevant under Fed. R. Evid. 401 because it does not bear on any of the elements of the charged offenses.

### B.  Public Authority and Entrapment by Estoppel

Notwithstanding the defendant's failure to provide notice under Fed. R. Crim. P. 12.3,[5] the government moves *in limine* to preclude Evans from arguing that he reasonably relied on President Trump's statements prior to the riot at the Capitol on January 6, 2021. Courts in this district have consistently rejected the application of the public authority defense in the January 6 context.[6]

"The public authority defense allows the defendant to seek exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity." *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001) (cleaned up). It "often arises when defendants claim to have been working as government informants conducting drug deals or other clearly illicit conduct at the behest of their official handlers." *Eicher*, 2023 WL 3619417, at *2. "The public authority defense is narrowly defined." *United States v. Navarro*, No. 22-cr-200 (APM), 2023 WL 371968, at *15 (D.D.C. Jan. 19, 2023) (quoting *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015)). To that end, a defendant "will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary

---

[5] Although Evans did not notice a public authority defense, numerous January 6 defendants have made public authority arguments at trial and the government moves to exclude such arguments out of an abundance of caution.

[6] *See, e.g.*, *United States v. Easterday*, No. 22-404 (JEB), 2023 WL 6646384, at *2-3 (D.D.C. Oct. 12, 2023); *United States v. Baez*, No. 21-0507 (PLF), 2023 WL 6364648, at *6-7 (D.D.C. Sept. 29, 2023); *United States v. Bru*, No. 21-352 (JEB), 2023 WL 4174293, at *2 (D.D.C. June 26, 2023); *United States v. Eicher*, No. 22- 38 (BAH), 2023 WL 3619417, at *4-8 (D.D.C. May 23, 2023) *United States v. Carpenter*, No. 21- 305 (JEB), 2023 WL 1860978, at *3 (D.D.C. Feb. 9, 2023); *United States v. Sheppard*, No. 21-203 (JDB), 2022 WL 17978837, at *7-9 (D.D.C. Dec. 28, 2022); *United States v. Grider*, No. 21-0022 (CKK), 2022 WL 3030974, at *3 (D.D.C. Aug. 1, 2022).

prerequisites." *Id.*[7]

First, "a federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, *and* the defendant must have reasonably relied on that authorization when engaging in that conduct." *Navarro*, 2023 WL 371968, at \*15 (quoting *Alvarado*, 808 F.3d at 484) (emphasis added). A defendant must show "that a government official affirmatively communicated to the defendant the official's approval of the conduct at issue," *Alvarado*, 808 F.3d at 485; *see also Sheppard*, 2022 WL 17978837 at \*9 (describing as "undisputed" the element that a defendant must rely on a conclusion or statement of law by the relevant official").

Second, "the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question." *Navarro*, 2023 WL 371968, at \*15 (quoting *Alvarado*, 808 F.3d at 484). Indeed, "[t]he validity of this defense depends upon whether the government agent in fact had authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the 'public authority.'" *United States v. Burrows*, 36 F.3d 875, 881-82 (9th Cir. 1994) (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)).

### 1. The Public Authority Defense Is Unavailable.

The public authority defense does not apply, as a matter of law, for several reasons. For starters, the President lacks the actual authority to sanction the riot at the Capitol on January 6, or

---

[7] "[T]he D.C. Circuit has not articulated in a binding opinion either the elements of the [public authority defense (and its close cousin, entrapment by estoppel)] or the procedure by which a court should consider them." *Sheppard*, 2022 WL 17978837, at \*7. However, for the reasons set forth herein, the Court need not determine the precise contours of the defense to find that the evidentiary basis for the defense is lacking here. *See id.* at \*8.

any of the criminal conduct perpetrated by the defendant. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 32–33 (D.D.C. 2021); *see also United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990). The President has no power to unilaterally "waive statutory law." *Chrestman*, 525 F. Supp. 3d at 33. Because Defendant cannot show that the former President had actual authority to authorize his criminal conduct on January 6, the public authority defense is not available as a matter of law. [8]

Second, Evans cannot point to any government official who advised him that his conduct was legal. The public authority defense is "available only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful." *Carpenter*, 2023 WL 1860978, at *2 (quoting *Sheppard*, 2022 WL 17978837, at *9). As courts have consistently held, the President's speech at the Ellipse on January 6 "neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *Sheppard*, 2022 WL 17978837, at *9; *see also Carpenter*, 2023 WL 1860978, at *3 ("Because the Court is persuaded that Trump's statements at the January 6 rally do not plainly state or imply that entering the Capitol or interfering with the electoral certification would be

---

[8] The same reasoning applies to any argument advanced by Evans based on acts or omissions of the U.S. Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022), ECF No. 87. Even if Evans could establish that a member of law enforcement told him that it was lawful to enter the Capitol building or allowed him to do so, the defendant's reliance would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32. An officer also cannot shield an individual from liability by failing to enforce the law or ratifying unlawful conduct by failing to prevent it. As then-Chief Judge Howell explained in the context of another January 6 case, "[s]ettled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, ECF No. 87 at 3.

lawful, they cannot support an entrapment-by-estoppel or public-authority defense"); *Grider*, 2022 WL 3030974, at *3 ("Grider has identified no statement by former President Trump—or any other government official—assuring him that obstructive trespass on Capitol grounds was lawful"). The former President's words encouraged "those at the rally to march to the Capitol—nothing more—and do not address legality at all." *Sheppard*, 2022 WL 17978837, at *9. Because the President's statements do not amount to an express or implied statement of legality, the public authority defense is not available.

Third, even assuming (counterfactually) that the President's statements had specifically addressed the legality of his conduct, Evans cannot show that his reliance was reasonable. "[A] defendant makes out a defense of public authority only when he has shown that his reliance on governmental authority was reasonable as well as sincere." *Burrows*, 36 F.3d at 882. This reasonableness requirement is necessary to ensure the "uniform enforcement of law"; otherwise, anyone could interpret a public official's actions or statements as authorizing them to engage in criminal conduct. *Id.* "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (quoting *United States v. Batterjee*, 361 F.3d 1210, 1216-17 (9th Cir. 2004); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard).

Along with a mob of other rioters, Evans took several unlawful steps, including knowingly trespassing on restricted grounds and entering the Capitol despite the signs of violent entry. Even if Evans were able to show that he subjectively believed such conduct was lawful, that belief is, as a matter of law, objectively unreasonable. At a minimum, when Evans entered the Senate Parliamentarian Door and heard the blaring alarm, any reasonable person in that circumstance

16

would "[know] he was breaking the law" regardless of the President's purported authority. *Corso*, 20 F.3d at 529. Evans should therefore be prohibited from making arguments or attempting to introduce evidence that President Trump or any other government official authorized his conduct at the Capitol.

Accordingly, this Court should therefore preclude the defense in advance of trial. Courts have routinely rejected jury instructions or requests to put on evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defense's requirements. *See, e.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) (affirming denial of motion to appoint psychological expert to testify in support of entrapment-by-estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as a matter of law).

## 2. The Entrapment-By-Estoppel Defense Is Also Unavailable.

Because "[t]he difference between the entrapment by estoppel defense and the public authority defense is not great," in an abundance of caution, the government submits that the entrapment-by-estoppel defense should be rejected as well. *Burrows*, 36 F.3d at 882; *see also United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006) ("The elements that comprise the two defenses are quite similar."). "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and

the substance of the misrepresentation." *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018); *see also Chrestman*, 525 F. Supp. 3d at 33 (adopting *Cox* test).

Here, Evans cannot satisfy any part of the entrapment-by-estoppel test. The President (or any other government actor for that matter) never purported to interpret the scope of the criminal statutes Defendant is charged with violating. In other words, there is no evidence that the former President "affirmatively assure[d] the defendant that certain conduct [was] legal." *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *see also Chrestman*, 525 F. Supp. 3d at 32 (explaining that the defense in the January 6 context "would not be premised . . . on a defendant's confusion about the state of the law and a government official's clarifying, if inaccurate, representations. It would instead rely on the premise that a defendant, though aware that his intended conduct was illegal, acted under the belief President Trump had waived the entire corpus of criminal law as it applied to the mob").

### C.  Selective Prosecution, Charging Decisions, and Other Riots

Finally, the government moves *in limine* to exclude evidence and arguments regarding selective prosecution, charging decisions, and comparisons to other riots and protests.

The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Wayte v. United States*, 470 U.S. 596, 607 (1985)). "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Armstrong*, 517 U.S. at 464 (citing U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547. Generally, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand

jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 124-25 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

A "presumption of regularity supports … prosecutorial decisions" such that "in the absence of clear and convincing evidence to the contrary, courts presume that [the Attorney General and United States Attorneys] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (internal quotation marks and citations omitted). This presumption exists because "the decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis courts are competent to undertake." *Id.*; *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016). The presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465.

Here, Evans may claim that he has been unfairly singled out for prosecution because of his political views, that others with different political views have been treated differently, or that—at the very least—his conduct does not merit criminal charges. Such evidence is irrelevant, inadmissible, and only serves to divert the jury's attention to matters unrelated to rendering a fair and just verdict. In any event, a "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463. Courts in this district have uniformly rejected selective prosecution claims, understanding that January 6 was a unique attack on the peaceful transfer of power that threated the entire membership of Congress and the Vice

Case 1:24-cr-00471-RDM    Document 30    Filed 01/10/25    Page 20 of 20

President, resulted in hundreds of assaults on law enforcement officers, and cost millions of dollars in damage.[9]

**<u>CONCLUSION</u>**

For these reasons, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Jake E. Struebing
        JAKE E. STRUEBING
        Assistant U.S. Attorney
        D.C. Bar No. 1673297
        U.S. Attorney's Office for the
        District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        Phone: (202) 252-6931
        Email:  Jake.Struebing@usdoj.gov

---

[9] *See United States v. Brown*, 22-cr-170 (CKK), ECF No. 105 (D.D.C. June 10, 2024); *United States v. Brett*, No. 22-cr-11 (RJL), June 17, 2024 Minute Order; *United States v. DaSilva*, 21-cr-564 (CJN), July, 12, 2 023 Order; *United States v. Miller*, 21-cr-119 (CJN), ECF No. 67 (D.D.C. Dec. 21, 2021); *United States v. Bennet*, 21-cr-312 (JEB), 2023 WL 6847013 (D.D.C. Oct. 17, 2023); *United States v. McHugh*, 21-cr-453 (JDB), 2023 WL 2384444, at \*13 (D.D.C. Mar. 6, 2023); *United States v. Padilla*, 21-cr-214 (JDB), 2023 WL 1964214, at \*4-6 (D.D.C. Feb. 13, 2023); *United States v. Judd*, 579 F. Supp. 3d 1, 5-9 (D.D.C. 2021); *United States v. Costianes*, 21-cr-180 (RJL), Apr. 27, 2023 Minute Order; *United States v. Groseclose*, 21-cr-311 (CRC), ECF No. 67 (D.D.C. Oct 27, 2023); *United States v. Brock*, 21-cr-140 (JDB), 2022 WL 3910549, at \*11-12 (D.D.C. Aug. 31, 2022); *United States v. Rhodes*, 22-cr-15 (APM), 2022 WL 3042200, at \*4-5 (D.D.C. Aug. 2, 2022); *United States v. Griffin*, 549 F. Supp. 3d 49, 58 (D.D.C. 2021).

20